**Swiss Re**

David Marseille
Claims Consultant
Lawyers Professional Liability
david_marseille@swissre.com

Westport Insurance Corporation
Specialty Claims
P.O. Box 29221
Shawnee Mission, KS 66201

T (312) 821-4245
F (877) 880-1590
www.swissre.com

March 16, 2010

Sent via facsimile (337) 237-9129

L. Lane Roy, Esq.
Preis, Kraft & Roy
Versailles Centre
102 Versailles Boulevard, Ste. 400
Lafayette, LA 70501

Re:  Insured:   Preis, Kraft & Roy
     Claimant:  National Union Fire Insurance Company of Pittsburgh, PA
     Matter No.: 2028056

Dear Mr. Roy:

As you know Westport Insurance Corporation has been defending a legal malpractice action that is being pursued against your law firm by National Union Fire Insurance Company of Pittsburgh, PA. The lawsuit in question is pending in the Civil District Court for the Parish of Orleans, State of Louisiana. It bears the controversy caption "National Union Fire Insurance Company of Pittsburgh, PA vs. Michael DeBlanc and Preis & Roy f/k/a Preis, Kraft and Roy and John Does 1 through 10". The docket control no. to the suit is 07-5331. *(the AIG Claim)*

Westport first received notice of the AIG claim on May 10, 2007. The insurance coverage that has been responding to the claim is found through a policy issued by Westport Insurance Corporation identified by the contract number WLW 308004446501 *(the policy)*. The policy is a claims-made and reported insurance contract that features a coverage period that ran from June 30, 2006 to June 30, 2007. The policy's limit of liability is $10,000,000 per claim and in the aggregate. Claim expenses incurred by Westport serve to reduce the policy's coverage when those expenses are incurred. The policy features a $25,000 deductible that applies against claim expenses as well as any settlement, judgment or award the claimant might recover against your firm. . The policy's coverage is subject to the written contract's insuring agreements, definitions, conditions and exclusion provisions.

Westport is continuing its investigation of the AIG claim and in this capacity we recently requested copies of the deposition transcripts and exhibits for the sworn

EXHIBIT
4

**Swiss Re** 

testimony of Michael DeBlanc and Frank Piccolo. Within Messrs. DeBlanc and Piccolo's testimony is recognition on their part that the viability of the plaintiff's subrogation claim in the underlying case "Newell Andry, et al vs. Murphy Oil, USA et al" was in jeopardy after the trial court entered a judgment in favor of Murphy Oil which failed to address or reference the claims of the underwriters, namely Zurich, National Union, INA and Reliance. The testimony reveals that written and verbal communication occurred within Preis, Kraft & Roy during the 2005-2006 time period about potential repercussions of the trial court's judgment, including concern that the basis to a legal malpractice claim existed. Testimony to this regard is found in Mr. Piccolo's deposition that was taken on July 27, 2009. On that date some of the testimony he furnished is as follows:

> Q. Okay. From the standpoint of potential malpractice, did you get involved?
> A. Only to the extent that I asked Michael to provide me with or actually provide Lane, Roy, with a – synopsis of what the issue was – issues were, what the potential problems could be in order that we could place our ENO carrier, malpractice carrier on notice as necessary.
> Q. And that analysis, is that one of the documents that are being withheld?
> A. Yes.
> Q. Okay. There are three or – there are five documents that are being withheld. You were in here when Gus identified them under a claim of privilege, all in the July and August 2005 timeframe. Is that the period in which you were evaluating whether to put your carrier on notice?
> A. Correct.
> Q. And did you put your carrier on notice during that period of time?
> A. I do not believe we did...
>
> \*          \*          \*          \*
>
> Q. Do you know why the decision was made not to put your carrier on notice them?
> A. I believe, this is to the best of my recollection, it was because the, because there was an appeal in place, and there's no decision rendered on the appeal, that we didn't, we didn't believe that there was a trigger as yet, depending on what happened with the appeal. Because the appeal court could have come down and completely fixed whatever the potential problem was then.
> Q. When the appellate court issued their opinion in June of 2006, June the 14th of 2006, did you at that time put your carrier on notice?
> A. I believe we did, yes.
> A. Because that would have triggered, in your words, "the problem"?
> Q. Correct. Even though I understood that they were going to appeal it to the Supreme Court, yes...
>
> \*          \*          \*          \*
>
> Q. When did you put your carrier on notice? Was it within a short period of time after the decision of the Fourth Circuit?
> A. I believe so, yes. Well, I take that back. May 10th, 2007.
> Q. Okay.
> A. As a result of a letter from AIG to me telling me to put my carrier on notice.

Similar to Mr. Piccolo's testimony, Mr. DeBlanc acknowledges an awareness of problems associated with the underwriter's claims against Entergy in 2005 that could

**Swiss Re**



result in the law firm being sued. Testimony to this regard is found in the sworn statement he provided on July 27, 2009 which reads in part as follows.

> Q. When the opinion came out of the Fourth Circuit, it basically took away the damages associated with the underwriters insured payments?
> A. It did what?
> Q. Well, it didn't – the Fourth Circuit did not award any damages for the payments that the underwriters had made for property damage or business interruption, and it did not award any damages for the class action?
> A. That's correct.
> Q. So what the Fourth Circuit did was, Murphy Oil got 40 percent of their uninsured interest?
> A. As I recall, I would have to let the opinion speak for itself...
>
>    *   *   *   *
>
> Q. Mr. DeBlanc, when we started the deposition today, there were five documents that were identified in the July of 2005 and August of 2005 timeframe which have not been produced and are being withheld as – being withheld in anticipation of litigation. And so we'll take that up through separate motion, if need be. But what I wanted to ask you was, was there some event that caused you to anticipate litigation against you as a result of this circumstance involving the judgment in the Andry case?
> A. Could you rephrase the question?
> Q. The earliest document that is on the list that's being withheld I have dated July 7, 2005. So at least as of that date, based on the claim of privilege, there was some anticipation of litigation that you or Preis, Kraft and Roy had. All I'm asking you is, what transpired to cause you to have that anticipation?
> A. I can't answer that question without getting into the privileged documents.
> Q. Well, was there an event that caused you to have a concern that you would be sued over this?
> A. Me?
> Q. Yes.
> A. Let me answer your question this way. I don't recall any particular event, but I did not anticipate being sued individually, no.
> Q. You anticipated that the law firm may be sued?
> A. Yes.
> Q. Okay. And you anticipated that over the way the judgment was handled, or what?
> A. Well, it was obviously related to that, yes.
> Q. Had anybody made any specific threats, demands or anything such as that on you to cause you to have that feeling?
> A. I don't, I don't recall – I think you used the term "suit" in your question, and I don't recall anybody mentioning the word "suit", or "bringing an action." I do recall Mr. Frilot and Mr. Noonan using the word "malpractice" in some of our discussions. And Mr. Frilot used it in reference to himself as well as said that what I had done.
> Q. How did he use it? What did he say?
> A. I had a telephone conversation with him at some point, most likely after the Entergy brief had been filed. And again, I don't recall what specifically in that brief triggered the concern, but it obviously triggered the same concern in him – triggered some concerns. And I remember a telephone conversation with him about that time, and I remember he used words to this – you know, you better put your carrier on notice, or words to that effect. And he also said, For all I know, I've committed malpractice too, or words to that effect.

**Swiss Re** 

Besides the deposition testimony certain of the exhibits entered into the record reveal concerns within your law firm that an act, error, omission or circumstance existed during the 2004- 2006 time period, which is prior to the inception of coverage under the policy, that could serve as the basis to a legal malpractice claim against Mr. DeBlanc and the Preis, Kraft and Roy firm.

The deposition testimony and the corresponding exhibits serve to create a coverage issue under the policy as the insurance contract features an exclusion that bars coverage for any claim if an insured, prior to the inception of the insurance contract's policy period, is aware of an act, error, omission or circumstance that might give rise to a claim before the policy's coverage incepts. In this instance the policy's coverage period runs from June 30, 2006 to June 30, 2007, while it appears the Fourth Circuit's ruling was issued in 2004. Messrs. DeBlanc and Piccolo later engaged in communication about a possible malpractice situation no later than the 2005 calendar year. Because this coverage issue exists, Westport will be handling the AIG Claim under a full reservation of rights. To provide you with some information as to how the policy's coverage operates, including any limitations thereto, we cite to you a portion of the insuring agreements, the definition of the term POLICY PERIOD and then a policy exclusion that is pertinent to this discussion. The insuring agreements read in part as follows:

    I.    INSURING AGREEMENT

    A. The Company shall pay on behalf of any INSURED all LOSS in excess of the deductible which any INSURED becomes legally obligated to pay as a result of CLAIMS first made against any INSURED during the POLICY PERIOD and reported to the Company in writing during the POLICY PERIOD or within sixty (60) days thereafter, by reason of any WRONGFUL ACT occurring on or after the RETROACTIVE DATE if any;

The term POLICY PERIOD is found in the above cited insuring agreement and this is a defined term that carries the following meaning:

    POLICY PERIOD MEANS the period state in the Declarations, unless terminated earlier pursuant to Section V. of these GENERAL TERMS & CONDITIONS;

Within the policy's exclusions as found in the GENERAL TERMS & CONDITIONS contract form is the following provision that is pertinent to this discussion.

    XIV. Exclusions

This POLICY shall not apply to any CLAIM based upon, arising out of, attributable to, or directly or indirectly resulting from:

B. any act, error, omission, circumstance or PERSONAL INJURY occurring prior to the effective date of this POLICY if any INSURED at the effective date knew or could have reasonably foreseen that such act, error, omission, circumstance or PERSONAL INJURY might be the basis of a CLAIM:

**Swiss Re**

Because of the issues described herein, Westport will be handling the AIG Claim under a full reservation of rights. No act of the Company by way of its investigation or the defense that is being offered is meant to be construed as a voluntary waiver of the Company's rights as afforded by the policy or the applicable common law. Westport expressly reserves its right to decline coverage for this claim should it be established by the record as it develops in the underlying case and / or by Westport's continued investigation that the claim is not covered under the policy. The company is also reserving its right to recover any defense costs it funds defending the AIG Claim, if it is ultimately determined that the policy's coverage does not apply to the claim. Furthermore the Company is reserving its rights to issue further reservations, should additional coverage issues come to our attention as this matter progresses. Finally the Company is reserving its right to file a declaratory judgment action to determine the rights of the parties under the policy relative to the AIG Claim

Because Westport will be acting under a reservation of rights, your firm and Mr. DeBlanc are entitled to hire a personal attorney to represent your respective interests for any uninsured or excess liability exposure that may be inherent to the AIG Claim. If any defendant exercises their right to be represented by a personal counsel, that insured will have to fund the cost of their personal attorney, as the policy's defense coverage does not extend to the cost of a personal attorney. Preis, Kraft & Roy initially chose Mr. Fritchie to act as defense counsel at the onset of the AIG claim. Since Mr. Fritchie was selected by the defendants to represent them for the claim, Mr. Fritchie can act as your and Mr. DeBlanc's independent counsel for this matter.

If you need to correspond with Westport about the contents of this letter or the claim in general you may facsimile letters to the insurance company using the fax number (877) 880-1590 or you can use the following address to correspond by mail:

        Westport Insurance Corporation
        Specialty Claims
        P.O. Box 29221
        Shawnee Mission, KS 66201

Make sure to include a "regarding section" with any correspondence you send, that includes the Named Insured (your firm), the case controversy caption and the Westport case number which is 2048056. You can also communicate with me electronically through the e-mail address "david_marseille@swissre.com".

Sincerely
David Marseille
Claims Consultant


cc: Michael DeBlanc   via email michael.deblanc@zurichna.com